**Robert A. BARCLAY, Plaintiff,**

v.

**AMTRAK, Defendant.**

**Civil Action No. 03–CV–2450.**

United States District Court, E.D. Pennsylvania.

June 20, 2006.

Robert A. Barclay, Elkton, MD, pro se.

Thomas S. Bloom, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Pro se[1] Plaintiff Robert A. Barclay ("Barclay") brings suit against the National Railroad Passenger Corporation, commonly known as Amtrak, alleging discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

---

1. Barclay requested appointment of counsel, and in an Order of February 18, 2004, I granted this request and directed the Clerk's Office to appoint counsel. However, the Clerk's Office was unable to find counsel willing and able to represent Barclay.

§ 12101 *et seq.* Before me is Defendant's motion for summary judgment. For the reasons set forth below, I will grant Defendant's motion.

## I. BACKGROUND[2]

Plaintiff Robert A. Barclay worked for many years as a locomotive engineer for Amtrak. (Def.'s Mot. Summ. J. Ex. 1, Barclay Dep. at 13) (hereinafter "Barclay Dep."). He suffers from irritable bowel syndrome (IBS).[3] (Id. at 25.) In August 1997, Barclay sought permission from Amtrak's medical department to take the medication Bentyl, which he had been prescribed for his IBS, while operating a locomotive. (*Id.* Ex. 2, Memo from Amtrak Medical Department.) Bentyl sometimes caused Barclay to experience light-headedness, dizziness, and drowsiness. (Barclay Dep. at 31.) Barclay was informed that he could operate a train while taking the medication only with a note from his personal physician. (*Id.* Ex. 2.) However, Dr. George Benes, Barclay's doctor, was unwilling to certify Barclay to operate a train while taking Bentyl. (*Id.* Ex. 3, Letter of 9/17/97 from Dr. Benes.) Because Barclay needed Bentyl to control his IBS and was not cleared to operate a train while taking it, he was placed on medical restriction by Amtrak from December 10, 1997 until 1999, during which time he did not work as a locomotive engineer.[4] (Id. Ex. 4, Memo from Dr. Harold Haase, Amtrak Medical Director.)

On February 22, 1999, Barclay received a note from a Dr. Michael Glowacki which stated: "Robert Barclay has IBS and is no longer on Bentyl and may return to work without restrictions." (*Id.* Ex. 5.) On March 15, 1999, Barclay returned to work for Amtrak as a locomotive engineer. (Pl.'s Brief Statement of Facts, Br. of Organization to National Mediation Board at 8.) During the period from April 16, 1999 to May 11, 1999, Amtrak recorded Barclay as having 17 unexcused absences. (*Id.* Ex. 6, 9/30/99 Notice of Discipline.) On August 5, 1999, an Amtrak doctor, Dr. Natalie Hartenbaum, confirmed that Barclay had been cleared to return to work as an engineer. (Id.Ex.7.) On September 30, 1999, as a disciplinary measure for his unexcused absences in April and May, Barclay was given a time-served suspension and a "final warning" regarding absenteeism. (*Id.* Ex. 6.)

During the period from January 4, 2000 to April 20, 2000, Amtrak recorded Barclay as having 28 unexcused absences. (*Id.* Ex. 9, Hearing Officer Disciplinary Decision of 7/25/00.) Barclay's personal physician at the time, Dr. John Mulvey, stated in a letter to Amtrak that Barclay's IBS was well controlled, his taking 20 mg of Bentyl in the evening would not interfere with his operation of a locomotive, and he was "unrestricted as a locomotive engineer." (*Id.* Ex. 11, Letter of 3/27/00 from Dr. John Mulvey.)

---

**2.** I state the facts in the light most favorable to the plaintiff, the non-moving party, and take his allegations as true when supported by proper proofs wherever those allegations conflict with those of Defendant. *See Kopec v. Tate,* 361 F.3d 772, 775 (3d Cir.2004).

**3.** Irritable bowel syndrome (IBS) is "[a] common gastrointestinal disorder marked by abdominal pain which can be cramping or steady. The pain is often accompanied by constipation or diarrhea, or alternating diar-

rhea and constipation...." J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine and Word Finder* I–203 (2005). Although Barclay states that he suffers from other health problems, IBS is the only disability relevant to his claims in this lawsuit. (Barclay Dep. at 26.)

**4.** To be precise, it is undisputed that Barclay did not operate a locomotive during this time and the record does not indicate that he was working for Amtrak in some other capacity.

After reviewing documentation provided by Barclay and his physicians, Amtrak's medical department concluded that Barclay's absences in early 2000 were not medically justified. (*Id.* Ex. 10, Memo of 4/20/00 from Nurse Marianne Letterio.) Specifically, Nurse Letterio noted that Barclay had a medical examination at Omega Medical Center on February 21, 2000, in the middle of his period of prolonged unexcused absences, and this medical examination had not indicated any impediments to his operating as an engineer. (*Id.*)

Amtrak commenced disciplinary proceedings against Barclay for his absenteeism and scheduled a disciplinary hearing for May 2, 2000; when Barclay did not attend this hearing, it was rescheduled for June 21, 2000. (*Id.* Ex. 12, 6/13/00 Notice of Hearing.) Barclay was notified that his failure to appear could result in the hearing being held in absentia. (*Id.*) When Barclay did not attend the June 21 hearing, it was rescheduled for July 17, 2000, and Barclay was again notified that the hearing could proceed in absentia if he did not attend. (*Id.* Ex. 13, 6/22/00 Notice of Hearing.) Barclay did not appear for his disciplinary hearing on July 17, 2000; he reported being too ill to leave the house that day. (Barclay Dep. at 231.) Accordingly, the proceeding was held in absentia, although a representative from Barclay's union, Ellen Scher, attended and represented Barclay's interests. (*Id.* at 231–32.)

On July 25, 2000, the Amtrak hearing officer issued a decision immediately terminating Barclay's employment with Amtrak for excessive absenteeism. (*Id.* Ex. 9, Hearing Officer Disciplinary Decision of 7/25/00.) The hearing officer based this decision on the testimony of Barclay's division road foreman, Carmine Palumbo ("Palumbo") as to Barclay's unexcused absences, and the testimony of Nurse Letterio that the absences were not medically

justified. (*Id.*). Barclay's union appealed this decision to the National Mediation Board, and on February 21, 2001, the Board affirmed Barclay's dismissal but ruled that he should be given one last chance to return to work. (*Id.* Ex. 14, National Mediation Board Decision.) However, Barclay did not return to work because he felt incapable of performing the job due to disability. (Barclay Dep. at 244.) The last day that Barclay worked for Amtrak was May 21, 2000. (*Id.* at 142.) Barclay claims that since that date, he has been unable to work at any job, with or without accommodation. (*Id.* at 141–42.)

On April 24, 2003, Barclay filed a complaint in this Court which, liberally construed, alleged violations of the ADA, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S.A. § 951 *et seq.*, as well as state law defamation and invasion of privacy claims. On November 10, 2004, I granted Defendant's motion to dismiss with respect to the Rehabilitation Act, PHRA, and state law claims on the ground of timeliness. I denied the motion with respect to Barclay's ADA claim.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). In order to survive summary judgment, a plaintiff must make make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla. *Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir.2005) (citing *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505). Thus, in order to defeat Amtrak's motion, Barclay "must introduce more than a scintilla of evidence showing that there is a genuine issue for trial; [h]e must introduce evidence from which a rational finder of fact could find in h[is] favor." *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir.2005) (citations omitted).

## III. DISCUSSION

The Americans with Disabilities Act provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). In this case, Barclay sets forth three claims under the ADA: (1) that he was wrongfully terminated on the basis of his disability (IBS); (2) that Amtrak failed to reasonably accommodate his disability; and/or (3) that he was subjected to a hostile work environment on the basis of his disability. Amtrak asserts that Barclay has not raised a genuine issue of material fact for trial under any of these causes of action. As explained fully below, Amtrak is correct.

### A. *Termination*

■ To prevail on a claim that Amtrak terminated him on the basis of his disability, Barclay must first make out a prima facie case of disability discrimination. That is, he must show: (1) that he had a "disability" within the meaning of the ADA; (2) that he was qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he suffered an "adverse employment action" such as termination as a result of his disability. *Williams v. Phila. Housing Auth. Police Dep't,* 380 F.3d 751, 761 (3d Cir.2004).

As in any ADA case, the first question answered must be whether Barclay has a disability within the meaning of the statute. The ADA defines an individual with a "disability" as having "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C.A. § 12102(2); *see Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 306 (3d Cir.1999). Here, Amtrak assumes for the purposes of its motion that Barclay's IBS constitutes a disability under the ADA. Amtrak also seems to assume that Barclay suffered an adverse employment action when he was terminated on July 25, 2000.

■ Amtrak argues, however, that Barclay cannot establish a prima facie case because he fails to show that, as of the date he was terminated, he was qualified to perform the essential functions of the

job, with or without reasonable accommodation. *See Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir.1998) (individual must be able to perform the essential functions of job at the time of the employment decision). Determining whether an individual is "qualified" under the ADA involves a two-part test. *Id.* "First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (citations omitted).

■ Amtrak does not dispute that Barclay had the proper education and experience to do his job as a locomotive engineer. Rather, Amtrak argues that Barclay is not "qualified" because he claims he was not able to perform the essential functions of the position of locomotive engineer at the time he was fired, either with or without accommodation.[5] Indeed, in response to Amtrak's interrogatories and at his deposition, Barclay indicated that as of May 21, 2000, the last date that he worked for Amtrak, he was unable to work at any job at all:

> Q: [T]urning your attention back to your response to interrogatory number 11, which says, I've been unable to work any job since [May] 21st, 2000 ... is this a correct statement that you were unable to work any job since May 21st, 2000?

A: Yes.

(Barclay Dep. at 140–41.)

> Q: And ... does that mean, also, with or without any accommodation, you can't work any job right now?
>
> A: No. And—yes, that would be correct. I'm unable to ... work due to mental and physical problems.
>
> Q: And that's been true ever since May 21 st, 2000?
>
> A: Yes.
>
> Q: All right. And May 21 st, 2000 is the last day you worked for Amtrak?
>
> A: Yes.

(*Id.* at 142.)

> Q: So as you sit here today, testifying in this deposition, you're totally unemployable?
>
> A: Yes.
>
> Q: Okay. For how long have you been totally unemployable?
>
> A: Since the last day I worked for Amtrak.

(*Id.* at 253–54.) Thus, according to Barclay's testimony, he was not able to perform the essential functions of his job, with or without accommodation, at the time Amtrak terminated him.

In his response to Amtrak's motion for summary judgment, Barclay attempts to clarify his deposition testimony by noting that he "did not consider himself completely [disabled] until July 2002 when it was determined that the plaintiff had heart disease prior in 6/21/2001 [b]y Dr. Miller." (Pl.'s Resp. Def.'s Mot. Summ. J. at 3.)

---

5. In this case, the only possible "accommodation" for Barclay's disability that either party has raised is reassignment to a position other than locomotive engineer, which is an entirely separate claim that I address in section III.B *infra.* For instance, Barclay makes no allegation that he could have operated a train if he had been allowed to work a modified schedule. *See* 42 U.S.C. § 12111(9)(B) (listing job restructuring, modified schedules, and special equipment as examples of reasonable accommodation). Thus, setting aside for the moment whether Barclay could have been transferred to another position, the question of whether he could perform the essential functions of his locomotive engineer job "with or without accommodation" is basically the question of whether he could operate a train.

However, regardless of when Barclay considered himself "completely disabled," he has stated that at the time of his termination from Amtrak, he was unable to perform his job as a locomotive engineer with or without accommodation. Moreover, to the extent that Barclay's statement in his response brief contradicts his deposition testimony, Barclay has not explained this contradiction.[6]

■ The ADA was intended to prevent employers from irrationally discriminating against employees who, though suffering from a disability, are nonetheless qualified to perform their jobs either with or without reasonable accommodation. It does not, however, require an employer to retain an employee who cannot perform the essential functions of the job even with accommodation. *See Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 145 (3d Cir.1998) *(en banc)* (to be "qualified individual" protected by ADA, employee must be able to perform essential functions of job). If Barclay claims that he could not do his job at the time of his termination from Amtrak, he cannot make out a prima facie case of disability discrimination.

■ Furthermore, even if I assumed that Barclay were qualified to do his job at the time of his termination and ignored Barclay's own statements to the contrary, Amtrak would still be entitled to summary judgment.[7] Amtrak has provided a legitimate, nondiscriminatory reason for why it terminated Barclay, that is, excessive absenteeism. *See Ross v. Kraft Foods N.A., Inc.,* 2004 WL 2755838, at *4 (E.D.Pa. Nov. 24, 2004) (Brody, J.) (granting summary judgment where plaintiff did not create genuine issue as to whether his termination for absenteeism was pretext for disability discrimination). To survive summary judgment, Barclay would have to present some evidence creating a genuine issue of fact as to whether Amtrak's stated reason was actually a pretext for discrimination on the basis of his disability. *See Shaner v. Synthes,* 204 F.3d 494, 500–01 (3d Cir.2000). Barclay has not done so. Amtrak terminated Barclay in July of 2000 for having 28 unexcused absences in a four month period in early 2000, and his dismissal was upheld by the National Mediation Board. Although Barclay claims that these unexcused absences were due to his disability and were medically justified, there is no evidence that he

---

6. "When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991). Of course, "there are situations in which sworn testimony can quite properly be corrected by a subsequent affidavit. Where the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact." *Martin v. Merrell Dow Pharm., Inc.,* 851 F.2d 703, 705 (3d Cir.1988). However, if Barclay is now claiming that his prior statements about being unable to perform his job as of May 21, 2000 are not correct, he must at least provide an explanation for why they are not correct. Otherwise, his later statement

cannot create a genuine issue of material fact. *See id.* at 706 (plaintiff's affidavit could not create genuine issue of material fact where it contradicted, without any explanation, several of her prior sworn statements on a crucial issue).

7. Of course, this case is complicated by the fact that the medical evidence, particularly Dr. Mulvey's letter to Amtrak of March 27, 2000, appears to contradict Barclay's assertions that he could not work as an engineer at the time he was terminated. In this letter, Barclay's physician Dr. Mulvey stated that Barclay's IBS was well controlled, his taking 20 mg of Bentyl in the evening would not interfere with his operation of a locomotive, and he was "unrestricted as a locomotive engineer." (Def.'s Mot. Summ. J. Ex. 11.)

ever presented medical excuses for his absences. Rather, Amtrak's hearing officer found that the absences came during a time when Barclay was medically cleared to operate a locomotive.[8]

In short, Barclay's position in this litigation presents a difficult Catch–22 for him. If a fact-finder were to accept Barclay's testimony that he could not perform any job at the time of his termination from Amtrak, then he has not made out a prima facie case of disability discrimination under the ADA. If, on the other hand, a fact-finder accepted the evidence indicating that Barclay could work without restrictions, then Barclay has no explanation for the unexcused absences that resulted in his termination, and thus he cannot show that Amtrak's stated reason stated reason for terminating him—excessive absenteeism—was pretextual. Because in either case Amtrak would be entitled to summary judgment, I will grant summary judgment to Amtrak on Barclay's claim of discriminatory termination.

## B. *Reasonable Accommodation*

■ Barclay also has a claim against Amtrak for failure to reasonably accommodate his disability. The crux of this claim is that, from the time when Barclay was

first medically restricted from operating a locomotive, Amtrak failed to reasonably accommodate his disability by transferring him to another position that he could perform.[9] To survive summary judgment on a reasonable accommodation claim, Barclay must first make out a prima facie case of Amtrak's failure to reasonably accommodate his disability by transferring him to another position. To do so, he must show: (1) that there were vacant, funded positions available; (2) that these positions were at or below the level of his former job; and (3) that he was qualified to perform the essential duties of one or more of these jobs with or without reasonable accommodation. *Donahue v. Consol. Rail. Corp.*, 224 F.3d 226, 230 (3d Cir.2000).

■ In *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir.1999), the Third Circuit stated that "while an employee who wants a transfer to another position ultimately has the burden of showing that he or she can perform the essential functions of an open position, the employee does not have the burden of identifying open positions without the employer's assistance." *Id.* at 316. Rather, both the disabled employee and the employer must engage in an "interactive process" to determine ap-

8. Indeed, because Barclay did have a well-documented disability, for which he received legitimate medical leave, Amtrak seems to have carefully considered whether Barclay's early 2000 unexcused absences were medically justified before terminating him. Before Amtrak even commenced disciplinary proceedings against Barclay, the medical department first concluded that his absences were not medically justified. (Def.'s Mot. Summ. J. Ex. 10, Memo of 4/20/2000 from Marianne Letterio.) Nurse Letterio testified to that effect at Barclay's disciplinary hearing. (*Id.* Ex. 9, Hearing Officer Disciplinary Decision of 7/25/00.) Barclay argues that he was not given permission to work while taking Bentyl until Dr. Mulvey's letter of March 27, 2000. However, the uncontroverted evidence shows that Barclay was cleared to operate a locomo-

tive as early as February 22, 1999 (*Id.* Ex. 5, Letter of 2/22/99 from Dr. Glowacki), and as Amtrak's medical department found, Barclay's February 21, 2000 medical examination does not indicate any restrictions on his operating a locomotive. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 1–A, 2/21/00 Report of Physical Examination from Omega Health Center.)

9. Barclay admits that, at least during the time of his official medical restriction, there was nothing that could be done to make him able to operate a locomotive consistent with his IBS and his medication. (Barclay Dep. at 81.) However, reasonable accommodation of an employee's disability can sometimes entail reassignment to another position that he or she can perform. 42 U.S.C.A. § 12111(9)(B).

propriate accommodations for the employee. *Id.* at 312; *see also Williams*, 380 F.3d at 771–72. However, the Third Circuit has since clarified that "if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant—even if it also appears that the defendant failed to engage in good faith in the interactive process." *Shapiro v. Township of Lakewood*, 292 F.3d 356, 360 (3d Cir.2002) (quoting *Donahue*, 224 F.3d at 234). Here, Barclay has not shown that there were open positions for which he was qualified. Thus, I do not address whether Amtrak engaged in the interactive process as it was required to do.[10]

Barclay has not presented any evidence that, during the relevant time period, there were open positions at Amtrak that he was capable of performing. Barclay argues that the existence of such jobs "would be impossible to ... prove as Mr. Palumbo awarded any special duty or training jobs himself," that "[t]hese jobs [were] never advertised," and that "[t]his issue can be best addressed in trial with witness testimonies." (Pl.'s Resp. Def.'s Mot. Summ. J. at 3.) Barclay also claims that there were in fact jobs to which he could have been transferred, and that at some point he requested a transfer but was ignored:

> This was during the high speed up grade and the opening of the Engineers school in Wilmington Del. There [were] a large number of jobs including Road Foreman. The plaintiff asked Division Road Foreman Palumbo verbally in person for

a position where bathrooms were available. Mr. Palumbo's reply was no I need someone who will work.

(Pl.'s Resp. Def.'s Mot. Summ. J. at 2.) At his deposition, Barclay spoke in similarly general terms about the types of positions to which he would like to have been transferred: "[E]ither special duty or an instructor at the engineer school, at least try it to see if I can possibly work full time...." (Barclay Dep. at 82.)

While Barclay would like an opportunity to show at trial that were available positions to which he could have been transferred, Amtrak is entitled to know now, at the summary judgment phase, what evidence Barclay has of vacant, funded positions, at or below the level of his former job, whose essential functions he was capable of performing. *Donahue*, 224 F.3d at 230 (granting summary judgment where plaintiff produced no evidence of available positions for which he was qualified). Barclay has identified the positions of road foreman, instructor at the engineer school, and "special duty" as jobs to which he would like to have been transferred. Even if I accepted as true Barclay's testimony that he believed such jobs were available, Barclay has not provided any evidence of the level of these jobs, their essential duties, or his qualifications to perform them.[11] He has not, therefore, made out a prima facie case of failure to reasonably accommodate.

■ I recognize that it may have been difficult for Barclay, proceeding pro se, to gather evidence of the types of positions available and their requirements. Indeed, the Third Circuit has noted that "[i]n

---

10. I note, however, that it might have been possible for Amtrak to avoid this entire litigation by working with Barclay to find an accommodation for his disability. *See Williams*, 380 F.3d at 772 n. 16; *Deane*, 142 F.3d at 149.

11. For instance, Barclay did not know whether the engineering school instructor position was a union or a management position, which bears on whether he was eligible for it. (Barclay Dep. at 82.)

many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer." *Taylor*, 184 F.3d at 316 (quoting *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.1997)). Nonetheless, the law requires that Barclay present such evidence by the time of summary judgment, and he could have tried to obtain it through depositions or document requests. Although pro se parties are generally given greater latitude in the courts, "merely because a non-moving party is proceeding pro se does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." *Boykins v. Lucent Tech., Inc.*, 78 F.Supp.2d 402, 408 (E.D.Pa.2000) (Robreno, J.). Indeed, Barclay did conduct several depositions of his former co-workers through which he was able to learn information helpful to his case.

Because Barclay has not made out a prima facie case that there were jobs available at Amtrak during the relevant time period for which he was qualified, he has not raised a genuine issue of material fact as to his reasonable accommodation claim, and I will grant summary judgment to Amtrak on this claim as well.

### C. *Hostile Work Environment*

■ Finally, Barclay claims that Amtrak subjected him to a hostile work environment on the basis of his disability. To prevail on a hostile work environment claim under the ADA, Barclay must prove: (1) that he is a qualified individual with a disability under the ADA; (2) that he was subject to unwelcome harassment; (3) that the harassment was based on his disability or a request for an accommodation; (4) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment; and (5) that Amtrak knew or should have known of the harassment and failed to take prompt effective

remedial action. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667 (3d Cir.1999).

■ Here, Barclay claims that his supervisors at Amtrak, particularly his division road foreman Carmine Palumbo, harassed him in several principal ways over a period of time: (1) Palumbo repeatedly asked for doctor's notes from Barclay to explain his absences (Barclay Dep. at 94–95.); (2) Palumbo wanted Barclay to obtain his permission before marking off sick (*Id.* at 95); (3) Palumbo put Barclay on speakerphone and allowed other employees to listen when Barclay called in sick (*Id.* at 98; Joseph Harry Dep. at 87–88 (hereinafter "Harry Dep.")); (4) road foremen would perform frequent safety and speed checks on Barclay and his locomotive that they did not do with other engineers (Barclay Dep. at 107–108, 113; Harry Dep. at 18–21, 64); and (5) Barclay was subjected to an investigation by the Amtrak inspector general regarding a rumor that he was using his sick time to operate a side-business (Barclay Dep. at 116–20; Frank Stigliano Dep. at 12 (hereinafter "Stigliano Dep.")). However, because Barclay cannot show that this conduct was based on his disability or request for accommodation, or that it was sufficiently severe or pervasive to alter the conditions of his employment, Amtrak is entitled to summary judgment.

### 1. Was the conduct based on Barclay's disability or request for an accommodation?

■ The record reflects that Barclay's treatment by his supervisors, particularly Palumbo, ranged from insensitive to downright obnoxious. Several witnesses testified that Palumbo had a "personal vendetta" against Barclay and wanted him fired. (Harry Dep. at 18, 21; Stigliano Dep. at 11.) However, the Americans with Disabilities Act does not make all harassment,

or every unpleasant working environment, actionable under the law. Rather, to constitute a hostile work environment under the ADA, the harassing conduct must be *because of* the plaintiff's disability. *See McCutchen v. Sunoco, Inc.*, 2002 WL 1896586, at *12 (E.D.Pa. Aug.16, 2002) (Reed, J.) ("To state a hostile work environment claim, plaintiff must show that the harassment was caused by a discriminatory animus."); *see also Walton*, 168 F.3d at 667. "A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability." *Walton*, 168 F.3d at 667 (quoting *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir.1997)). Here, Barclay has not raised a genuine issue of material fact that his disability, as opposed to several other potential reasons, was the basis of the conduct.

■ In determining whether a plaintiff has established a case of hostile work environment sufficient to defeat summary judgment, a court must consider the record as a whole. *Cardenas v. Massey*, 269 F.3d 251, 260–61 (3d Cir.2001); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). When viewed as a whole, the record in this case does not reflect that Barclay was harassed *because of* his disability, i.e., because of his irritable bowel syndrome. At his deposition, Barclay could not recall any statements by his supervisors that indicated discrimination on the basis of his disability. (Barclay Dep. at 252–53.) Rather, the testimony of Barclay and several of his former co-workers indicates that Palumbo and the other supervisors' treatment of Barclay was motivated by several other factors, most significantly Barclay's excessive absenteeism.

The testimony of Barclay and his co-workers indicates that Palumbo was hostile to Barclay not because of Barclay's IBS per se, but because he felt Barclay was taking too many days off, irrespective of his disability:

> [T]he fact *that I was continuously missing time* aggravated him to the point where it escalated to . . . it was like a nightmare.

(Barclay Dep. at 106 (emphasis added).)

> Q: [W]hat was your understanding of why they were, in your words, gunning for Robert?
>
> A: Because of the amount of time off.

(Stigliano Dep. at 170)

> Q: Anything else other than—you just referred to comments by Mr. Palumbo about Mr. Barclay taking time off and firing him if he continues to do that. Anything else that you observed Mr. Palumbo do that you would characterize as harassing?
>
> A: No.

(Joseph Whalen Dep. at 9.)

Of course, one could argue that any time a supervisor harasses an employee for absences that the employee claims were caused by a disability, it constitutes harassment *because of* the employee's disability. However, the Third Circuit rejected such a broad view of hostile work environment under the ADA in *Walton*. The plaintiff in *Walton* suffered from depression, and like Barclay, took numerous prolonged absences from work ostensibly because of her disability. *See* 168 F.3d at 664. The plaintiff claimed that her supervisor subjected her to a hostile work environment on the basis of her disability by, among other things, (1) calling plaintiff ten days consecutively at a time when she was hospitalized, asking each day when she would be returning to work, and (2) telling plaintiff she would be fired if she did not attend a work-related event that she had

received permission not to attend. *Id.* at 667. Thus, in *Walton,* as in this case, the plaintiff claimed that she had been harassed by a supervisor for absences from work that were caused, and indeed, excused by her disability. However, the Third Circuit held that the plaintiff had "not asserted facts that would allow a reasonable jury to find that [her supervisor] harassed her because of her disability. . . . The fact that [the supervisor]'s behavior toward Walton may have been offensive does not indicate that it was based on Walton's disability."[12] *Id.; see also McCutchen,* 2002 WL 1896586 at \* 12 (granting summary judgment because plaintiff showed no evidence that the alleged harassment was based on his disability); *Martin v. Allegheny Airlines, Inc.,* 126 F.Supp.2d 809, 820–21 (M.D.Pa.2000) (Rambo, J.).

▓ Indeed, the testimony indicates that, far from harassing Barclay *because of* his IBS, Palumbo was indifferent to, or ignored, the possible medical reasons for his absences:

> And [Barclay] was actually sick. He had the medical officer—the chief medical officer knew he was sick when he took the medication and he couldn't work. *Everybody knew this but Carm[ine].* Carm[ine] was gunning for him. It was a typical Philly thing to gun for an engineer *if they didn't like them.*

(Stigliano Dep. at 12 (emphasis added).)

> Carm[ine] . . . said that here he is bringing up this bullshit about the medical director saying he can't work . . . [b]ecause of the medication that he's on.

(Harry Dep. at 88.) The uncontroverted evidence shows that, rather than reflecting animus toward Barclay because of his IBS, Palumbo's behavior reflected other suspicions about Barclay and the reasons for his unexcused absences: (1) a suspicion that Barclay, admittedly a recovering alcoholic who had suffered from relapses (Barclay Dep. at 52–56, 59–60), was drinking on the job and/or taking days off when he had a hangover (Barclay Dep. at 121, 78–79; Harry Dep. at 21); (2) a rumor that Barclay was operating a side-business during his sick leave (Barclay Dep. at 119–20; Stigliano Dep. at 12); and (3) a general personality conflict with and dislike of Barclay (Barclay Dep. at 99; Harry Dep. at 18, 69, 90). The ADA does not protect an employee from every kind of harassment, but only from harassment that is based on the employee's disability or request for accommodation. *Compare Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006) ("Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.").

Indeed, out of the entire record, only one isolated statement by Joseph Harry even comes close to suggesting that Barclay's IBS was the motivating factor behind Palumbo's conduct: "I remember it being mentioned that—that Carmen did say medical, the medical director had restricted, restricted certain . . . things that you could do and that . . . it was our job to get rid of you." (Harry Dep. at 86–87.)

---

**12.** No doubt there are circumstances, not present in this case, in which an employer's harassment of an employee based on absence from work is clearly just a proxy for unlawful discrimination. *See Abramson v. William Paterson College,* 260 F.3d 265, 279 (3d Cir. 2001) ("Here, almost all of the incidents alleged centered around Abramson's insistence that she not work during the Sabbath. There-

fore, we hold that where, as here, the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her religion, the first prong of the prima facie case is met."). Barclay has simply not shown this kind of close nexus between his disability, his absences, and the alleged harassment.

However, this rather vague statement alone is simply not enough to create a genuine issue of material fact as to whether Palumbo harassed Barclay because he had IBS, and not for some other reason that is not protected by the ADA. *See Woloszyn*, 396 F.3d at 319 (on summary judgment, plaintiff must introduce more than a mere scintilla of evidence from which a rational fact-finder could find in his favor). When read as a whole, Harry's deposition indicates that Palumbo's suspicion of Barclay's drinking, or plain dislike of Barclay, was the reason behind his treatment:

> [Palumbo] said [Barclay] was a drunken bum.

(Harry Dep. at 21.)

> Q: Now, Mr. Harry, you indicate in your affidavit that ... Mr. Palumbo had a personal grudge against Mr. Barclay.... And I think you indicated earlier that you assumed that Mr. Barclay had offended Mr. Palumbo in some way; is that right?
>
> A: Yes.
>
> Q: Okay. Other than that assumption on your part, do you have any other knowledge of why Mr. Palumbo may have had a personal grudge against Mr. Barclay?
>
> A: No. It didn't take much for Carm[ine] to put you on his list. Carm[ine] either liked you or he didn't like you....

(*Id.* at 69.)

> Q: Is that what you thought it was between Mr. Barclay and Mr. Palumbo, personality and egos?
>
> A: Yes.

(*Id.* at 90.) I must consider any alleged comments by Palumbo "within the context of all of the evidence of harassment in the case, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his [disability]."

*Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir.2000). Here, neither the rest of Mr. Harry's deposition nor the record as a whole indicates that Barclay's IBS was the basis of his treatment by his supervisors, and thus Barclay has not established one of the elements of a hostile work environment claim.

**2. Was the conduct so severe or pervasive as to alter the conditions of Barclay's employment and create an abusive working environment?**

■ Even if Barclay could create a genuine issue as to whether the allegedly harassing conduct was based on his disability, the conduct was not "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Walton*, 168 F.3d at 667 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "To judge whether such an environment is hostile or abusive, [courts] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Here, *none of the acts* Barclay complains of, either singly or in combination, were so severe or pervasive as to change his conditions of employment. *See Walton*, 168 F.3d at 667 (granting summary judgment because alleged harassment was

not severe or pervasive); *see also Allen v. Verizon Pa.,* 418 F.Supp.2d 617, 631 (M.D.Pa.2005) (Conaboy, J.); *McCutchen,* 2002 WL 1896586 at *13; *Allegheny Airlines,* 126 F.Supp.2d at 821. Palumbo's insistence that Barclay produce doctor's notes for his unexcused absences, rather than constituting harassment, would seem to be required by Palumbo's role as Barclay's supervisor. Likewise, Palumbo's demand that Barclay check with him before taking a sick day, while perhaps annoying, does not appear to have ever prevented Barclay from marking off sick. (Barclay Dep. at 97.) The inquiry into Barclay's allegedly operating a business during his sick leave appears to have been a misunderstanding that was cleared up quickly (*id.* at 118), and is thus the kind of "isolated incident" that, unless extremely serious, will not amount to a hostile work environment. *Breeden,* 532 U.S. at 270–71, 121 S.Ct. 1508. The extra safety checks and close supervision understandably frustrated Barclay, who had been doing the job of engineer for many years. However, this extra supervision does not seem to have been so unreasonable, given that Barclay was entrusted with the safety of many rail passengers, that he had long periods of absence from his job for medical reasons, and was known to take a medication that could cause drowsiness. Even if, as several witnesses have suggested, this extra supervision was an attempt to catch Barclay in a safety violation so as to fire him, it is not "severe or pervasive" harassment to closely scrutinize an employee performing a potentially dangerous job so as to make him do it extremely carefully. It would be a different matter if Barclay claimed that his supervisors falsely accused him of trumped-up safety violations so as to harass him. Finally, while Palumbo's habit of putting Barclay on speakerphone when he called in sick was insensitive, "[i]nsensitivity alone does not amount to harassment; the ADA, like Title VII, is

not in effect a 'general civility code.'" *Allegheny Airlines,* 126 F.Supp.2d at 820 (quoting *Cannice v. Norwest Bank Iowa N.A.* 189 F.3d 723, 726 (8th Cir.1999)).

Because there is no genuine issue of material fact as to whether the alleged harassment was on the basis of Barclay's disability, and it did not, as a matter of law, rise to the level of severity or pervasiveness that is actionable under the ADA, I will grant Amtrak's motion for summary judgment with respect to Barclay's hostile work environment claim.

## IV. CONCLUSION

Because there are no genuine issues of material fact requiring a trial, I will grant Defendant's motion for summary judgment.

### ORDER

**AND NOW,** this *20th* day of June, 2006, upon consideration of the Defendant's Motion for Summary Judgment (Doc. # 28), and the briefs in support thereof and in opposition thereto, it is **ORDERED** that the motion is **GRANTED.**